CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

08/31/2018

JULIA C. DUDLEY, CLERK
BY: H. Wheeler
     DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Danville Division

| | | |
|---|---|---|
| VICKI G., | ) | |
| Plaintiff, | ) | Civil Action No. 4:17-cv-00037 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| NANCY BERRYHILL, | ) | By:   Joel C. Hoppe |
| Acting Commissioner, | ) |       United States Magistrate Judge |
| Social Security Administration, | ) | |
| Defendant. | ) | |

Plaintiff Vicki G. asks this Court to review the Acting Commissioner of Social Security's

("Commissioner") final decision denying her applications for disability insurance benefits

("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security

Act (the "Act"), 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by referral under 28

U.S.C. § 636(b)(1)(B). ECF No. 11. Having considered the administrative record, the parties'

briefs and oral arguments, and the applicable law, I find that the Commissioner's decision is

supported by substantial evidence and should be affirmed.

### I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see

also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether

substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th

Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *accord* 20 C.F.R. §§ 404.1505(a), 416.905(a). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional

capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Vicki G. filed her applications for DIB and SSI on December 30, 2015. Administrative Record ("R.") 63, 70, ECF No. 9-1. Vicki G. alleged onset of disability as May 1, 2013, because of migraines, high blood pressure, idiopathic peripheral neuropathy, osteoarthritis, atrial fibrillation, anxiety, depression, and acid reflux. R. 63–64, 70–71. Disability Determination Services ("DDS"), the state agency, denied both claims at the initial, R. 63–68, 70–75, and reconsideration stages, R. 77–88, 91–102. On October 4, 2016, Vicki G. appeared with counsel and testified about her medical conditions and alleged functional limitations at an administrative hearing before ALJ Brian P. Kilbane. R. 41–55. A vocational expert ("VE") also testified regarding the availability of jobs in the national and local economies. R. 55–60.

ALJ Kilbane denied Vicki G.'s applications in a written decision issued on November 28, 2016. R. 21–36. He found that her history of congestive heart failure, status-post pacemaker placement, hypertension, peripheral neuropathy, and chronic atrial fibrillation were "severe" medical impairments, but that they did not meet or medically equal any of the relevant Listings. *See* R. 23–27. All of Vicki G.'s other medical conditions documented in the record were "non-severe" impairments because they "were responsive to medication, did not require significant medical treatment, or did not result in any continuous exertional or non-exertional functional limitations." R. 24. ALJ Kilbane next evaluated Vicki G.'s residual functional capacity ("RFC")

3

based on all of her medical impairments. *See* R. 27–34. He determined that she could perform

"light work"[1] as defined in the regulations, except that she could frequently balance;

occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs; never climb ladders, ropes,

or scaffolds; and should avoid concentrated exposure to vibration, fumes, odors, dusts, gases,

poor ventilation, and workplace hazards. R. 27. Based on this RFC and the VE's testimony, ALJ

Kilbane concluded at step four that Vicki G. could perform her past relevant work as a

cosmetologist as that occupation was actually and generally performed. R. 34. Alternatively, the

ALJ concluded at step five that Vicki G. could perform other light occupations, such as a

garment sorter, price marker, and stock checker, that existed in significant numbers in the

national and local economies. R. 35–36. Therefore, ALJ Kilbane determined that Vicki G. was

not disabled. R. 36. The Appeals Council denied her request for review, R. 1–3, and this appeal

followed.

## III. Background

*A.    Treatment Records*

The Administrative Record documents Vicki G.'s medical conditions and interactions

with various medical providers from May 2012 through June 2016.

*1.    Neuropathy and Osteoarthritis*

Prior to the alleged onset date Vicki G. was diagnosed with neuropathy. R. 343–44. Her

treating physician, William Lewis, M.D., prescribed Neurontin. R. 338–39. On November 27,

2012, Vicki G. presented to Melissa Smith, F.N.P., complaining of general myalgias and joint

---

[1] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these lifting requirements can perform light work only if he also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1990).

pain for which she requested a steroid injection. R. 336–37. FNP Smith diagnosed osteoarthritis

and administered a Depo-Medrol injection. R. 337.

After this, Vicki G. apparently did not complain to her healthcare providers of any joint

pain, swelling, or arthritis, and often specifically denied these symptoms, until June 2015. *See* R.

295, 297, 301, 303, 305, 309–10, 312–13, 315, 319, 322, 327, 331. The only record of Vicki G.'s

arthritis between November 2012 and June 2015 comes from an office visit with William

Zimmer, M.D., on February 4, 2014, when Vicki G. sought treatment for a persistent chest cold.

R. 308–09. Vicki G. said that she had "arthritic pain" and that the prescription medication she

had been taking was too expensive, so Dr. Zimmer prescribed a more affordable medication. *Id.*

(substituting Mobic for Naprosyn). Dr. Zimmer did not note any abnormal musculoskeletal

findings on that date's physical examination. R. 309.

On June 15, 2015, Vicki G. called Dr. Lewis's office to request that Dr. Lewis write a

"To Whom It May Concern" letter excusing her from a vocational keyboarding class because it

would exacerbate her carpal tunnel syndrome. R. 291. Vicki G. explained that she failed a prior

keyboarding class because of her carpal tunnel and she hoped the doctor's letter would excuse

her from having to retake it. *Id.* Dr. Lewis refused to write the letter, as there was "no office note

addressing this" impairment. R. 290. After locating records from a previous provider, Dr. Lewis

examined Vicki G. on September 28, 2015. R. 287. Dr. Lewis noted that diagnostic tests

performed eleven years earlier were "thought to have been essentially normal" and Vicki G.

currently did not have "significant carpal tunnel to warrant retesting." *Id.* Vicki G. reported some

joint pain and osteoarthritic changes, and she complained of numbness in her hands and feet

"possibly consistent with a neuropathy." *Id.* On examination, Dr. Lewis found "maybe some

decreased sensation in the feet [and hands] more subjective than objective," but all "carpal tunnel

testing [was] definitely negative." *Id.* (emphasis omitted). He ordered blood work and X-rays of her hands because "they hurt the worst," *id.*, but these diagnostic tests came back normal with no fractures, dislocations, malalignment, bony erosions, or signs of rheumatoid arthritis, R. 356–58; *see also* R. 452.

Vicki G. later provided a disability form for Dr. Lewis to complete. *See* R. 285–86. On December 3, 2015, Dr. Lewis talked to Vicki G. on the phone to get more information for the disability form. *See* R. 284–85. His notes from this conversation reflect that Vicki G.'s "idiopathic peripheral neuropathy and osteoarthritis in multiple joints" caused burning in her arms, hands, legs, and feet which "prevent[ed] her from being able to do things that require any manual dexterity on a consistent basis." *See* R. 284. She also was "unable to stand for any significant period of time due to these problems in her legs and feet." *Id.*

On April 27, 2016, Vicki G. presented to Dr. Lewis to treat her recurrent maxillary sinusitis and to discuss her application for "disability on the bases of idiopathic progressive peripheral neuropathy and osteoarthritis with general aches and pains." R. 451. Dr. Lewis noted that Vicki G. reported "pain in [her] hips, back, knees, and legs," "numbness and some pain on [a] nerve root basis" in the upper and lower extremities, and tingling/cramping in all of her fingers. *Id.* She had "some pain" when she cocked her wrist and "minimal," "mildly positive signs" of carpal tunnel on exam during this visit, but Dr. Lewis again noted that more involved carpal tunnel testing performed several years earlier had been negative. *Id.* Dr. Lewis observed that Vicki G. had no frank weakness in her legs, but she "almost" had some muscle wasting in her quadriceps and hamstring, "marked" decreased sensation in her feet, and decreased sensation between the feet and knees. *Id.* She also had decreased sensation in her hands to the wrists. *Id.* She did have reflexes at her knees, but not at her ankles, and reflexes in both biceps and

6

brachioradialis were "flat."  R. 452. Dr. Lewis opined that Vicki G. was not able to sustain

activity for any significant period and she could not lift and hold things because her hand

numbness caused weakness over time, and he agreed to "fill out forms for her to try to

substantiate her position" that these symptoms were disabling. R. 451.

On June 10, Dr. Lewis completed a Medical Source Statement. R. 448–50. Dr. Lewis

opined that, as a result of her idiopathic peripheral neuropathy and generalized osteoarthritis,

Vicki G. could stand/walk for up to two hours and could sit for up to two hours total in an eight-

hour working day. *See* R. 448–49. She could rarely lift and carry up to twenty pounds and

occasionally lift and carry less than ten pounds. R. 449. She could occasionally twist, stoop, and

climb stairs; rarely crouch or squat; and never climb ladders. *Id.* She could use her arms to reach

10–20% of time during an eight-hour working day, but could use her fingers for fine

manipulations and her hands to grasp, turn, or twist objects less than 10% of an eight-hour

working day. *Id.* Dr. Lewis also indicated that Vicki G.'s pain or other symptoms were severe

enough to "frequently" interfere with attention and concentration needed to perform even simple

work tasks. *Id.* He did not indicate the number of days per month Vicki G. might miss work

because he believed that she was completely "disabled." R. 450. Asked to "identify the clinical

findings and objective signs" that supported his assessment, Dr. Lewis wrote: "See notes

4/27/16." R. 448; *see* R. 450.

    *2.*    *Atrial Fibrillation*

Vicki G. also has a history of cardiac problems. R. 283. In December 2010, a pacemaker

was implanted for "heart block." *See* R. 288. In June 2011, Vicki G. was diagnosed with atrial

fibrillation. R. 283. The record reveals three instances of Vicki G. complaining to providers

about significant shortness of breath related to atrial fibrillation and one additional instance of

7

her complaining of fatigue. *See* R. 314, 330, 338, 348. In January 2013, a routine pacemaker check showed Vicki G. had been in atrial fibrillation for the previous two weeks, but she reported feeling fine with no shortness of breath. R. 332–33. After an echocardiogram in March 2013 showed her ventricular function at 35–40%, Vicki G.'s cardiologist, Alexander Vigh, D.O., prescribed Coreg to control her atrial fibrillation. R. 325, 328. At her next three doctors' appointments on April 25, May 24, and June 14, Vicki G. denied heart palpitations, shortness of breath, or chest pains. R. 318, 319, 322. In August, Vicki G. once again complained of significant associated shortness of breath. R. 314. Over the next two years, Vicki G. consistently denied shortness of breath, chest pains, fatigue, dizziness, or loss of balance, and she reported tolerating her atrial fibrillation medications well. R. 291–92, 293–94, 294–95, 296–98, 303–07, 308–09, 311–12, 312–13. On September 22, 2015, she reported having difficulty with balance, but she had not fallen. R. 288. On September 28, she reported fatigue, but denied having any shortness of breath. R. 287. On March 1, 2016, Vicki G. reported having heart palpitations and shortness of breath. R. 440. Vicki G. denied ever needing to visit the emergency room for her atrial fibrillation during the relevant period. *See* R. 297, 304, 314, 330, 338, 348.

B.     *Opinion Evidence—DDS Examiners*

        The DDS medical examiners did not offer an assessment of Vicki G.'s functioning as part of the initial review of her applications in March 2016, because the record was insufficient to do so. *See* R. 63–75. On April 12, 2016, Donald Williams, M.D., evaluated Vicki G.'s functioning as part of the reconsideration review of her applications. R. 77–88, 91–102. Dr. Williams opined that Vicki G. could lift and carry twenty pounds occasionally and ten pounds frequently. R. 83, 97. She could stand and/or walk for about six hours and sit for about six hours during an eight-hour workday. R. 83–84, 97–98. Vicki G. could frequently balance and occasionally climb ramps

or stairs, stoop, kneel, crouch, and crawl. R. 84, 98. She could never climb ladders, ropes, or

scaffolds. *Id.* Vicki G. would need to avoid concentrated exposure to vibration, fumes, odors,

dusts, gases, poor ventilation, and workplace hazards. R. 85, 99. Dr. Williams explained that

these limitations accommodated Vicki G.'s pacemaker for her heart block, hypertension,

peripheral neuropathy, and chronic atrial fibrillation. R. 84–85, 98–99. Dr. Williams also

determined that Vicki G. had no limitations in pushing or pulling up to the weight limitations

previously mentioned and had no manipulative restrictions. R. 84, 98.

C.      *Vicki G.'s Testimony*

       At the administrative hearing in October 2016, Vicki G. testified that she could not work

after May 1, 2013, because of the pain and numbness in her arms and legs. R. 46–47. She also

testified about her osteoarthritis and said that she had pain and stiffness in her joints and bones

"all over [her] body." R. 47. Her pain was getting worse, typically a "nine, nine and a half" on a

ten-point scale, and she experienced this pain every day. R. 47–48. She did some light

housework, including dusting and washing dishes, but could do so for only "two to three

minutes" before "excruciating pain" required her to sit down and rest for "probably 15 to 30

minutes." R. 48–50. She could stand only "10 to 15 minutes" and could sit in a chair for only "10

to 15 minutes before it would start hurting." R. 50–51. She often had to lie down, usually for "an

hour at least two to three times during the day." R. 51. On bad days, she would probably need to

lie down all day, except to use the bathroom and get something to eat. R. 52. She had

"numbness" in her hands when "holding things," causing her to drop things a lot, and if she held

something long enough, she would eventually drop it. *Id.* She also had problems with

concentration, and sometimes her mind would "just go blank" and she would forget what she

was doing. R. 53. She felt short of breath every day as a result of her atrial fibrillation. *Id.* The

only thing she did to combat her pain was rest, R. 54, because it was "hard to mix [some]

medications with . . . other medications," R. 53. She did not handle stress well after the deaths of

her husband, mother, and brother. *Id.* She looked for work after leaving cosmetology,

specifically some kind of office work that would allow her to stand up or sit down. R. 54–55.

She was unable to find such a position and blamed the "economy . . . in Martinsville." R. 55. She

clarified that she could not work an office job even if hired, however, because her pain limited

her ability to sit and stand. *Id.*

## IV. Discussion

Vicki G.'s arguments on appeal generally impugn ALJ Kilbane's RFC assessment. *See*

Pl.'s Br. 3–11, ECF No. 15. A claimant's RFC represents her "maximum remaining ability to do

sustained work activities in an ordinary work setting on a regular and continuing basis" despite

her medical impairments. SSR 96-8p, 1996 WL 374184, at *2 (emphasis omitted); *see* 20 C.F.R.

§§ 404.1545, 416.945. It is a factual finding "made by the Commissioner based on all the

relevant evidence in the [claimant's] record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31

(4th Cir. 2011) (per curiam), and it must reflect the combined functionally limiting effects of

impairments that are supported by the medical evidence or the claimant's credible reports of pain

or other symptoms, *see Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015). The ALJ's RFC

assessment must "include a narrative discussion describing" how medical facts and nonmedical

evidence "support[] each conclusion," *Mascio*, 780 F.3d at 636, and explaining why he

discounted any "obviously probative" evidence, *Arnold v. Sec'y of Health, Educ. & Welfare*, 567

F.2d 258, 259 (4th Cir. 1977), that supports the individual's claim for disability benefits, *Ezzell

v. Berryhill*, 688 F. App'x 199, 200 (4th Cir. 2017). "[T]he ALJ must both identify evidence that

supports his conclusion and build an accurate and logical bridge from that evidence to his

conclusion" that the claimant retains a certain ability to sustain work-related activities. *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (alterations omitted); *accord Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016); *Mascio*, 780 F.3d at 636–37.

Vicki G. offers two reasons why ALJ Kilbane's decision fell short of these standards. First, she argues that the ALJ improperly assessed her credibility and failed to build a logical bridge between the evidence and his findings regarding her impairment-related functional abilities and limitations. *See* Pl.'s Br. 8–11. Second, she asserts that the ALJ erred by not giving greater weight to the medical opinion of Dr. Lewis, her treating physician. *See id.* at 3–7. These arguments are not persuasive.

A.    *Vicki G.'s Credibility*

The regulations set out a two-step process for ALJs to evaluate a claimant's symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. §§ 404.1529, 416.929; *see also* SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Lewis*, 858 F.3d at 866; *see also Craig*, 76 F.3d at 594. Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability," *Lewis*, 858 F.3d at 866, to work on a regular and continuing basis, *see Mascio*, 780 F.3d at 639. "The second determination requires the ALJ to assess the credibility of the claimant's statements about symptoms and their functional effects." *Lewis*, 858 F.3d at 866. When conducting this inquiry, the ALJ must consider all the evidence in the record bearing on the claimant's allegations that she is disabled by pain or other symptoms caused by a medical impairment or related treatment; he cannot reject the claimant's description of her symptoms "solely because the available objective medical evidence

11

does not substantiate" that description. 20 C.F.R. §§ 404.1529(c), 416.929(c). *See Lewis*, 858

F.3d at 866; *Hines*, 453 F.3d at 565. The ALJ also must give specific reasons, supported by

"references to the evidence," for the weight assigned to the claimant's statements. *Edwards v.

Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p,

1996 WL 374186, at *2, *4–5). The ALJ's articulated reasons for discounting a claimant's

complaints need only be legally adequate and supported by substantial evidence in the record.

*See Mascio*, 780 F.3d at 639; *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014)

(per curiam) (citing *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)).

 ALJ Kilbane's RFC finding restricted Vicki G. to light work with additional limitations

on her postural activities and workplace environment. R. 27. His written decision included an

accurate and thorough summary of the treatment notes and other medical evidence bearing on

Vicki G.'s allegations that her pain, numbness, and other symptoms are so continuous and/or

severe that she cannot work any longer. *See* R. 28–34. After considering all of the evidence, ALJ

Kilbane found that Vicki G.'s medically determinable impairments could reasonably be expected

to cause these alleged symptoms, but that her statements describing their intensity, persistence,

and limiting effects were "not entirely consistent with the medical evidence and other evidence

in the record." R. 28. He cited the lack of significantly abnormal findings on neurophysical

examinations and diagnostic tests throughout the relevant period, the routine and conservative

nature of the treatment she received for her cardiac impairments, Vicki G.'s own inconsistent

statements and complaints, and her activities of daily living as specific reasons why he

discounted her testimony and other subjective statements. *See* R. 32–33. Overall, substantial

evidence supports his adverse credibility determination.

 Vicki G.'s credibility arguments focus on comments that she made to the agency and to

her healthcare providers, the nature of her treatment, and the extent of her daily activities. *See*
Pl.'s Br. 8–11. She does not challenge ALJ Kilbane's findings that Vicki G. often either "did not
mention, or specifically denied," experiencing the symptoms and extreme limitations that she
described in her testimony when interacting with her own healthcare providers and that "repeated
physical examinations ha[d] failed to reveal any significant neurological deficits, difficulty with
sitting, or significantly decreased strength or range of motion of any extremity, as would be
expected with the degree of limitation alleged" at the administrative hearing. R. 32–33. These
findings are amply supported by the record, *see, e.g.*, R. 287, 291–98, 301, 303–13, 315, 319,
322, 327, 331, 451–52, and provide legitimate grounds to discount her subjective complaints. *See*
*Craig*, 76 F.3d at 595 (explaining that objective medical evidence is "crucial to evaluating the
intensity and persistence of a claimant's pain" and alleged functional limitations even though the
ALJ cannot reject the claimant's statements solely because the medical evidence does not
substantiate them); *Fluellen v. Colvin*, No. 4:14cv30, 2015 WL 2238997, at *4 (W.D. Va. May
12, 2015) (affirming the ALJ's adverse credibility determination where the claimant's medical
record showed that she repeatedly either failed to report or expressly denied the symptoms and
limitations that she described in her hearing testimony).

     Vicki G. first argues that the ALJ did not adequately explain how her "very limited" daily
activities undermined her allegations that she could not "sit or stand more than 10 to 15 minutes
and that she must lie down during the day." Pl.'s Br. 9–10. "An ALJ may not consider the *type* of
activities a claimant can perform without also considering the *extent* to which she can perform
them." *Woods*, 888 F.3d at 694. Here, ALJ Kilbane listed several categories of daily activities
that Vicki G. could perform and noted that they suggested a greater level of functioning than she
alleged. This is a reasonable assessment. Vicki G. said she could drive a vehicle and shop in

stores. Those activities appear inconsistent with her testimony that she could stand or sit for only 10 to 15 minutes at a time. R. 28, 50–51. Certainly, these activities alone do not establish that Vicki G. can perform work-like activities on a sustained basis, but they do provide support for the ALJ's more limited finding that she could function at a higher level than she claimed at the administrative hearing.   Thus, this reason provides some support for the ALJ's credibility assessment.

Next, Vicki G. asserts that the "medical evidence of record fully supports [her] allegations of disabling symptoms" and that the ALJ's contrary finding is "not supported by substantial evidence." Pl.'s Br. 8. In developing this argument, however, Vicki G. cites only to her own statements describing her symptoms and functional limitations either at the administrative hearing, "in paperwork completed for her disability claim," or during visits with her cardiologist. *See id.* at 8–10 (citing R. 48–53, 94, 246, 314, 321, 330, 346, 348, 440). The fact that Vicki G.'s subjective complaints appear in the medical record does not transform her symptoms into "clinical evidence" because "[t]here is nothing objective about a doctor saying, without more, 'I observed my patient telling me she was in pain.'" *Craig*, 76 F.3d at 590 n.2. ALJ Kilbane discussed Vicki G.'s statements to the agency describing her extremely limited capacities to sit, stand, use her hands, and persist in various tasks throughout the day, R. 28, and he gave specific reasons why "the degree of severity alleged lack[ed] support and consistency" with other relevant evidence in the record, including mostly unremarkable findings on physical examinations and "treatment notes show[ing] that she generally denied any complaints of chest pain, . . . dyspnea/exertional dyspnea, palpitations, and syncope" and often "did not mention, or specifically denied, complaints of joint pain, swelling or arthritis pain," R. 32–33. This explanation, which Vicki G. does not directly challenge, provides an accurate and logical bridge

14

between relevant evidence in the record and ALJ Kilbane's conclusion that Vicki G.'s

complaints of debilitating musculoskeletal pain and cardiac symptoms were not entirely credible.

*See Bishop*, 583 F. App'x at 68; *Fluellen*, 2015 WL 2238997, at \*4. Vicki G. clearly disagrees

with the ALJ's conclusion, but she does not point to any specific error in this aspect of his

credibility determination. *See Carr v. Berryhill*, No. 6:16cv10, 2017 WL 4127662, at \*5 (W.D.

Va. Sept. 18, 2017) ("The Court cannot simply look at the same evidence and reverse the ALJ on

the basis that it could have reached a different result.").

 Vicki G. also challenges ALJ Kilbane's finding that her complaints were inconsistent

with the "conservative" and "routine" nature of the treatment she received for her medical

conditions. Pl.'s Br. 10–11. The ALJ generally may "consider the conservative nature of a

[claimant's] treatment—among other factors—in judging the credibility" of her symptoms and

alleged limitations. *Dunn v. Colvin*, 607 F. App'x 264, 273 (4th Cir. 2015). Here, ALJ Kilbane

reasonably found that Vicki G. received "conservative treatment" for her cardiac impairments

because, aside from "routine" tests to ensure that her pacemaker continued to "function[] well,"

she only took medications and was encouraged to follow a "heart healthy diet." R. 32. *See*

*Tucker v. Astrue*, 897 F. Supp. 2d 448, 466–67 (S.D. W. Va. 2012) (describing prescription

medications and routine diagnostic testing as "conservative treatment" for cardiac impairments).

Vicki G. points out that she has a pacemaker and "received appropriate follow-up treatment

including examinations, testing, and medications," Pl.'s Br. 11, but she does not identify any

error in the ALJ's conclusion that this treatment was relatively "conservative" given Vicki G.'s

allegations that she suffered disabling shortness of breath and "daily chest pain from atrial

fibrillation," R. 32. *See Dunn*, 607 F. App'x at 275 ("[W]hen a claimant complains that her

alleged disability is so bad that she is unable to work in any job whatsoever, but the ALJ finds

that the treatment was not as aggressive as one would reasonably think would be employed if the alleged disability were actually that severe, then it is reasonable for the ALJ to conclude that the conservative treatment bears on the claimant's credibility.").

Vicki G. also faults ALJ Kilbane for not recognizing that prescription pain medications were the only "appropriate course of treatment" for her idiopathic neuropathy and osteoarthritis, and for failing "to point to any other treatment [she] should have obtained in order to convince the ALJ her allegations were supported." Pl.'s Br. 10 (noting that these "are not conditions amenable to surgery" or similarly invasive treatments). Her objections are immaterial, however, because ALJ Kilbane did not make any findings about the nature of the treatment Vicki G. received for those conditions when weighing her complaints of debilitating musculoskeletal pain and numbness. *See* R. 32. Instead, the ALJ accurately pointed out numerous instances where she expressly denied joint pain and associated symptoms while taking prescription pain medication, R. 32–33, but Vicki G. does not challenge that finding. *Cf. Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (per curiam) ("If a symptom can be reasonably controlled by medication or other treatment, it is not disabling."). Thus, there is no indication that ALJ Kilbane penalized Vicki G. for "failing to pursue non-conservative treatment options" where more aggressive options simply did not exist, *Lapierre-Gutt v. Astrue*, 382 F. App'x 662, 664 (9th Cir. 2010). *Compare id.* (reversing and remanding on these grounds), *with Dunn*, 607 F. App'x at 275 (affirming ALJ's adverse credibility determination where there was no indication the claimant "required more aggressive treatment yet received conservative treatment for other reasons").

Overall, ALJ Kilbane provided numerous reasons and relevant examples from the record to explain why he found Vicki G.'s complaints of debilitating pain and other symptoms not entirely credible. This discussion as a whole "both identif[ied] evidence that support[ed] his

conclusion and buil[t] an accurate and logical bridge from that evidence to his conclusion" that

Vicki G. was not as functionally limited as she alleged. *Woods*, 888 F.3d at 694 (alterations

omitted). Thus, I find that ALJ Kilbane's credibility analysis is supported by substantial

evidence. *See Bishop*, 583 F. App'x at 68.

B.      *Treating Physician's Medical Opinion*

        Vicki G. argues that ALJ Kilbane "should have given greater weight" to Dr. Lewis's

treating-source medical opinion describing her extremely limited physical capacities, as well as

the significant extent to which her medical conditions would impair her ability to stay on task in

the workplace. Pl.'s Br. 6; *see id.* at 4 (citing R. 449–50). Medical opinions are statements from

"acceptable medical sources," such as physicians, that reflect the source's judgments about the

nature and severity of the claimant's impairment, including his symptoms, diagnosis and

prognosis, functional limitations, and remaining abilities. 20 C.F.R. §§ 404.1527(a)(1),

416.927(a)(1). A treating physician's medical opinion is "entitled to controlling weight if it is

well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171,

178 (4th Cir. 2001); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Where, as here, the ALJ does

not give a treating physician's medical opinion controlling weight, the ALJ must "determine

what lesser weight should instead be accorded the opinion," taking into account factors such as

the nature and extent of the physician's treatment relationship with the claimant, how well the

physician explained or supported the opinion, the opinion's consistency with the record as a

whole, and whether the physician's opinion pertains to his or her area of specialty. *Brown v.

Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 256 (4th Cir. 2017); *see* 20 C.F.R. §§ 404.1527(c),

416.927(c). Although treating physicians' medical opinions deserve deference, the ALJ may

discount or reject such an opinion when there is "persuasive contrary evidence" in the record.
*Mastro*, 270 F.3d at 178; *see Bishop*, 583 F. App'x at 68; *Kersey*, 614 F. Supp. 2d at 693
(explaining that an ALJ may assign "little to no weight" to a treating physician's medical opinion
based on the factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c) if the ALJ "sufficiently explains
his rationale and if the record supports his findings").

Before weighing the available opinions, ALJ Kilbane set out an accurate and thorough
summary of the relevant medical evidence, including Dr. Lewis's treatment notes and his June
2016 medical opinion describing Vicki G.'s disabling functional limitations. *See* R. 29–34. Dr.
Lewis's treatment notes showed that in September 2015 he declined Vicki G.'s request for a
doctor's note excusing her from a keyboarding class because he had "no office note addressing"
her alleged carpal tunnel, R. 290, diagnostic testing performed many years earlier was "thought
to be essentially normal," and Vicki G.'s more recent complaints of tenderness and numbness
were not "significant" enough to warrant carpal tunnel testing given the "definitely negative"
objective findings on physical examination, R. 287. *See* R. 31, 33. Dr. Lewis ordered blood work
and X-rays of her hands, but the results were normal. R. 287, 356–58, 452; *see* R. 31. In April
2016, Vicki G. had "minimal," "mildly positive signs" of carpal tunnel syndrome and "flat"
reflexes in portions of both upper extremities. R. 451–52; *see* R. 32. Dr. Lewis also observed
normal reflexes and no frank weakness in the lower extremities, but decreased sensation from
her feet to her knees and what "almost" appeared to be muscle wasting in her quadriceps and
hamstring. R. 451–52; *see* R. 32. Dr. Lewis noted that he would "fill out forms for [Vicki G.] to
try to substantiate her position" that she was disabled from "idiopathic progressive peripheral
neuropathy and osteoarthritis with general aches and pains." R. 451 ("She is not able to sustain
her activity for any significant period of time. She is unable to lift and hold things because her

grasp with the numbness because weak over time and hands lose function." (spelling corrected)).

Those limitations appear in the June 2016 medical source statement. R. 448–50.

ALJ Kilbane gave "little weight" to Dr. Lewis's opinions that Vicki G. was extremely

limited in her abilities to sit, stand/walk, lift/carry, use her upper extremities, and generally

sustain work-related activities. *See* R. 34 (citing R. 448–50). He explained that these opinions

"appear[ed] based primarily on the claimant's statements without balance or objectivity and

[were] not well supported by the medical record as a whole, including Dr. Lewis's own treatment

notes" which documented "essentially normal" findings on neurophysical exams, as well as his

earlier comments that some of Vicki G.'s complaints seemed "more subjective than objective"

and were not "significant" enough to warrant extensive diagnostic testing. R. 34 (citing R. 287);

*see also* R. 33. Because these were "specific and legitimate reasons" for an ALJ to reject a

treating physician's medical opinion in its entirety, *Bishop*, 583 F. App'x at 67, this Court "must

defer" to ALJ Kilbane's determination unless it is not supported by substantial evidence in the

record, *Dunn*, 607 F. App'x at 271.

Vicki G. primarily objects that ALJ Kilbane's analysis improperly "focuse[d] on one part

of one note" documenting Dr. Lewis's comment that Vicki G.'s "decreased sensation and feet

appeared to possibly be more subjective than objective" and "ignored" his subsequent

examination findings that Vicki G. had "muscle wasting" in the quadriceps and hamstrings;

decreased sensation in her hands, calves, and hands; and absent or flat reflexes in portions of the

upper and lower extremities. Pl.'s Br. 5–6. I disagree. ALJ Kilbane acknowledged Dr. Lewis's

abnormal findings on the April 2016 physical examination, R. 32, but reasonably concluded that

the medical record as a whole documented "essentially" (not completely) normal findings on

neurophysical examinations and diagnostic tests throughout the relevant period, R. 29–34. Dr.

19

Lewis also specifically said he would complete this medical-source statement "for [Vicki G.] to try to substantiate her position" that she was disabled from "idiopathic progressive peripheral neuropathy and osteoarthritis with general aches and pains," and the functional limitations he identified in that form essentially mirror Vicki G.'s subjective description of severely limiting musculoskeletal pain, numbness, and malaise, *see, e.g.*, R. 46–53, 287, 291, 284–85, 451. "Thus, given the specific and legitimate reasons provided, the ALJ was permitted to reject the treating physician's opinion in its entirety." *Bishop*, 583 F. App'x at 67 (affirming ALJ's rejection of a "treating physician's medical opinion that appeared to mirror Bishop's subjective statements of his limitations" where the ALJ explained that the physician's "opinion and speculation" was "inconsistent with the mild to moderate diagnostic findings . . . and the generally normal findings during physical examinations").

Vicki G. also broadly objects that Dr. Lewis's treating-source medical opinions deserved greater weight than the non-examining DDS physician's opinion that she could perform a range of light work without any manipulative restrictions, *see* R. 97–99, but she does not identify any error in ALJ Kilbane's contrary conclusion, R. 33–34, or point to any specific piece of evidence not considered by the ALJ that might have changed the weights he assigned these conflicting medical opinions. Pl.'s Br. 6–8 (citing 20 C.F.R. § 404.1527(c)(2)–(5)). *See Dunn*, 607 F. App'x at 271; *Carr*, 2017 WL 4127662, at *5; *see also Johnson*, 434 F.3d at 653 ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." (brackets omitted)). Overall, then, ALJ Kilbane cited valid reasons supported by substantial evidence for discounting Dr. Lewis's medical opinion. Thus, the Court cannot find that he erred in his evaluation.

V. Conclusion

20

For the foregoing reasons, I find that substantial evidence supports the Commissioner's final decision. Accordingly, I respectfully recommend that the presiding District Judge **DENY** the Plaintiff's Motion for Summary Judgment, ECF No. 14, **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 18, **AFFIRM** the Commissioner's final decision, and **DISMISS** the case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to counsel of record.

ENTER: August 31, 2018

Joel C. Hoppe
United States Magistrate Judge